NOT FOR PUBLICATION

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------------------x
In re:                                                           Chapter 7

SANDEEP SHARMA,                                                  Case No. 12-14472 (SCC)


                                        Debtor.
------------------------------------------------------------------------x
CAPITAL BUSINESS CREDIT LLC,

                                        Plaintiff,

            -against-                                            Adv. Pro. No. 13-01346 (SCC)

SANDEEP SHARMA,

                                        Defendant.
------------------------------------------------------------------------x


**MEMORANDUM DECISION**
**GRANTING SUMMARY JUDGMENT**


A P P E A R A N C E S :

LAW OFFICE OF SANJAY CHAUBEY
The Empire State Building
250 Fifth Avenue, Suite 5013
New York, NY 10118
By:    Sanjay Chaubey, Esq.

LAW OFFICE OF GREGORY M. MESSER, PLLC
26 Court Street, Suite 2400
Brooklyn, NY 11242
By:    Gregory M. Messer, Esq.

*Attorneys for Defendant Sandeep Sharma*

HAHN & HESSEN LLP
488 Madison Avenue
New York, NY 10022
By:    John P. Amato, Esq.
       Maria A. Arnott, Esq.

*Attorneys for Plaintiff Capital Business Credit LLC*

# TABLE OF CONTENTS

FACTUAL BACKGROUND ...........................................................................................1

I.    The Parties and Their Business Relationship and Dealings...................................1

II.   Capital Advances Credit to the Companies Based on Assignments and Certifications
      Submitted by Mr. Sharma on Behalf of the Companies ......................................4

      A.  Mr. Sharma Makes Assignment Nos. 224 and 225 to Capital.......................4

      B.  Mr. Sharma Submits the June Inventory Certification to Capital ................5

III.  The Companies Cease Operating..........................................................................6

PROCEDURAL HISTORY..........................................................................................9

SUMMARY JUDGMENT STANDARD ....................................................................10

DISCUSSION ............................................................................................................11

I.    Applicable Law...................................................................................................11

II.   Pursuant to Section 727(a)(3) of the Bankruptcy Code, the Debtor is Not Entitled to a
      Discharge ...........................................................................................................13

      A.  Mr. Sharma Failed to Preserve Adequate Records .....................................15

      B.  The Failure to Preserve the Companies' Books and Records Made it Impossible
          for Capital to Ascertain Mr. Sharma's Liability as Guarantor of the Companies'
          Debt............................................................................................................18

III.  Mr. Sharma's Counterclaims Must Be Dismissed as a Matter of Law.............19

      A.  Rule 12(b)(6) Standard ..............................................................................20

      B.  Mr. Sharma Lacks Standing to Assert that Capital Fraudulently Induced the
          Companies to Enter into the Factoring Agreements and That Capital Breached the
          Factoring Agreements.................................................................................20

      C.  Capital Did Not Violate the Automatic Stay by Continuing the State Court Action
          Against the Companies After Mr. Sharma Filed for Bankruptcy ...............22

CONCLUSION..........................................................................................................23

**SHELLEY C. CHAPMAN**
**UNITED STATES BANKRUPTCY JUDGE**

Discharge, the doctrine that frees an individual debtor's future income from the encumbrance of past debts, lies at the heart of bankruptcy policy. Despite the recognized importance of the doctrine, a discharge is only available to an honest debtor. Where, as here, a debtor has engaged in wrongful conduct, it may be appropriate to deny him a discharge, notwithstanding the underlying goal of federal bankruptcy law to provide a debtor with a fresh start. Before the Court is a motion for summary judgment on a non-dischargeability complaint filed by plaintiff Capital Business Credit LLC. Capital objects to the Debtor's entitlement to a discharge under 11 U.S.C. § 727(a)(3) and to the dischargeability of certain debts under 11 U.S.C. §§ 523(a)(2) and (6). Plaintiff Capital seeks (a) summary judgment on each of its claims for relief asserted in its complaint against the defendant-debtor, Mr. Sandeep Sharma, and (b) summary judgment on the affirmative defenses and counterclaims asserted by Mr. Sharma in his answer. The Court finds that Mr. Sharma failed to preserve the books and records of his business enterprise and therefore must be denied a discharge under section 727(a)(3) of the Bankruptcy Code. The Court also finds that the defenses and counterclaims asserted by Mr. Sharma must be dismissed as a matter of law. Accordingly, Capital's motion for summary judgment is granted.

## FACTUAL BACKGROUND

### I.   The Parties and their Business Relationship and Dealings

Capital Business Credit LLC ("Capital"), a Delaware limited liability company with a principal place of business in New York, is engaged in the business of, among other things, factoring and commercial finance. (Affidavit of Robert Grbic in Support of Plaintiff's Motion for Summary Judgment dated December 16, 2013 [Docket No. 15-2] ("Grbic Aff.") ¶ 1.) Mr.

1

Sandeep Sharma (the "Debtor") is the President and sole shareholder of three New York corporations – Sierra Fashions, Inc., Sierra Sportswear Inc., and Dollz Sportswear Inc. (collectively, the "Companies") – which were engaged in the business of producing, importing, and distributing men's and women's clothing, until the Companies ceased operating on or around August 24, 2012. (Grbic Aff. ¶ 2.)

In 2010, Mr. Sharma, on behalf of each of the three Companies, entered into factoring agreements (as amended, modified, and supplemented, collectively, the "Factoring Agreements") with Capital, which are governed by New York law. Under the terms of each of the Factoring Agreements, the Companies agreed to sell and assign *bona fide* accounts receivable to Capital and grant Capital a first priority security interest in and general lien on all of the Companies' existing and after-acquired accounts, general intangibles, contract rights, documents, and all proceeds derived therefrom (the "Collateral").[1] (Statement Pursuant to Local Civil Rule 7056-1 [Docket No. 15-1] ("Statement") ¶ 9; Grbic Aff. Ex. 5 (Factoring Agreements) ¶ 9.) In return, Capital agreed under the Factoring Agreements to finance, in its discretion, up to 90 percent against the Companies' eligible purchased accounts receivable and up to 50 percent against the cost value of the Companies' eligible finished goods inventory (valued at the lower of cost or market). (Grbic Aff. Ex. 5 (Factoring Agreements) ¶ 4(d).) The Factoring Agreements expressly required that each of the Companies keep proper books and records which would be available to Capital for inspection.[2]

---

[1]      It is undisputed that Capital duly perfected its security interest in and to the Collateral. (Grbic Aff. ¶ 26 (citing Ex. 7); Defendant's Answer, Affirmative Defenses, and Counterclaims [Docket No. 6] ("Answer") ¶ 3.)

[2]      Under the Factoring Agreements, the Companies "agree to keep proper books of record [sic] and accounts in accordance with sound and accepted accounting practices, which books shall at all times be open to inspection by [Capital]." (Grbic Aff., Ex. 5 (Factoring Agreements) ¶ 11(d).) The Factoring Agreements also prohibit the Factoring Agreements from being modified in any way except in writing. (Grbic Aff., Ex. 5 (Factoring Agreements) ¶ 11(g).)

In connection with the Factoring Agreements, Mr. Sharma, on behalf of each of the Companies, also executed and delivered to Capital three Security Agreement Supplements – Inventory (collectively, the "Security Agreements"), which are governed by New York law. Each of the Security Agreements provides that, in addition to Capital's other Collateral, the Companies granted and pledged to Capital "a continuing general lien on and security interest in all Inventory now and hereafter owned by [the Companies]."  (Grbic Aff. Ex. 6 (Security Agreements) ¶ 1.)

As President and sole shareholder of the Companies, Mr. Sharma executed each of the Factoring Agreements and Security Agreements on behalf of the Companies.  (Grbic Aff. ¶ 23.) In his position as President and sole shareholder, Mr. Sharma was responsible for, among other things, ensuring the Companies' compliance with the various terms and requirements set forth in the Factoring Agreements and Security Agreements, along with managing the importation of goods and overseeing the sales of such goods.

In October 2010, Mr. Sharma executed and delivered to Capital unconditional personal guaranties (collectively, the "Guaranties") of each of the Companies' obligations to Capital arising under the Factoring Agreements and the Security Agreements.  (Statement ¶ 12; Grbic Aff. ¶ 26 (citing Ex. 9 (Guaranties)).)  The Guaranties each provide that Mr. Sharma is "unconditionally" liable as the primary obligor on any and all indebtedness, obligations, and/or liabilities of the Companies to Capital.[3]

---

[3]    Each of the Guaranties expressly provides that Mr. Sharma

>     unconditionally . . . guarantees and agrees to be liable for the full and indefeasible payment and performance when due of all now existing and future indebtedness, obligations or liabilities of [the Companies], howsoever arising, whether direct or indirect, absolute or contingent, secured or unsecured, whether arising under any of the Agreements as now written or as amended or supplemented hereafter, or by operation of law or otherwise.

Finally, Capital entered into written agreements with the two warehouses that the

Companies used to store inventory (collectively, the "Warehouse Agreements") – Access Plus

Warehouse & Logistics ("Access Plus") and JND Warehousing Limited ("JND," and, together

with Access Plus, the "Warehouses").  (Statement ¶ 13; Grbic Aff. ¶ 25 (citing Ex. 8 (Warehouse

Agreements)).)

## II.  Capital Advances Credit to the Companies Based on Assignments and Certifications Submitted by Mr. Sharma on Behalf of the Companies

### A.  Mr. Sharma Makes Assignment Nos. 224 and 225 to Capital

In July and August 2012, the Companies made two assignments to Capital, Assignment

Nos. 224 and 225, which purported to represent the Companies' sale of approximately $495,000

worth of Henry Grethel goods to SteinMart Buying Corporation ("SteinMart").  (Statement

¶¶ 26-27; Grbic Aff. ¶¶ 69-70.)  Accompanying Assignment Nos. 224 and 225 were bills of

lading purporting to evidence shipments of the Henry Grethel goods from Access Plus to

SteinMart.  (Statement ¶ 28; Grbic Aff. ¶ 70.)

By submitting Assignment Nos. 224 and 225 to Capital as provided for under the

Factoring Agreements, the Companies expressly warranted, guaranteed, and represented to

Capital that the receivables were valid, genuine, and correct, and were "created by a customer's

express order for, and the actual sale and physical delivery of," the goods.[4]  (Statement ¶ 28;

Grbic Aff. Ex. 5 (Factoring Agreements) ¶ 7.)  In reliance on Assignment Nos. 224 and 225,

Capital advanced $415,000 to the Companies.  (Grbic Aff. ¶ 80.)

---

(Grbic Aff. Ex. 9 (Guaranties) at 1.)  Each of the Guaranties also provides that it "may not be modified except in writing," and that "no course of dealing between [Capital] and [Mr. Sharma]" would be "effective to change or modify [the] Guaranty."  (Grbic Aff. Ex. 9 (Guaranties) at 3.)

[4]      The Factoring Agreements provide, in pertinent part, that the Companies each "represent and warrant to [Capital] that: (i) each Receivable is a *bona fide* existing obligation created by a customer's express order for, and the actual sale and physical delivery of, or legal passage of title to, goods or the rendering of services to customers in the ordinary course of business, which goods, prior to sale, [the Companies] owned free and clear of any liens or encumbrances, and which Receivable is then unconditionally owing to [the Companies] without dispute, defense, offset, or counterclaims. . . ."  (Grbic Aff. Ex. 5 (Factoring Agreements) ¶ 7.)

In July 2012, however, SteinMart canceled its order for the goods reflected in
Assignment Nos. 224 and 225.  Almost a month later, on August 21, 2012, Capital received a
chargeback from the Companies for $495,000 (the "Credit Memo"), reflecting the cancellation.
(Statement ¶ 37; Grbic Aff. ¶¶ 72-47 (citing Ex. 11).)

### B.    Mr. Sharma Submits the June Inventory Certification to Capital

Under the Factoring Agreements, the Companies were required to provide to Capital
monthly inventory certifications reflecting the inventory maintained at that time by the
Companies.  (Grbic Aff. ¶ 81.)  On July 11, 2012, the Companies submitted an inventory
certification (the "June Inventory Certification"), in which the Companies represented and
warranted to Capital that, as of June 30, 3012, the Companies owned inventory totaling
approximately $3.191 million, which included $400,545 worth of the Henry Grethel goods that
were part of Assignment Nos. 224 and 225, calculated at cost.  (Statement ¶ 40; Grbic Aff. ¶ 82
(citing Ex. 30).)  In reliance on the representations in the June Inventory Certification, Capital
advanced credit to the Companies at a rate of 50 percent of the value of the cost of eligible
inventory in accordance with the formula set forth in the Factoring Agreements.  (Statement
¶ 47; Grbic Aff. ¶ 86 (citing Ex. 5 (Factoring Agreements) ¶ 4(d).)[5]

In September 2012, Capital conducted a physical count of the inventory located at the
Warehouses.  (Statement ¶ 48; Grbic Aff. ¶ 87; *see also* Grbic Aff. Ex. 31.)  By comparing the
physical count of the Companies' inventory in the Warehouses to Capital's calculation of the
inventory that the Companies represented to Capital was on hand as of August 2012, Capital
determined that 397,407 pieces of inventory were missing from the Warehouses, resulting in a
loss of collateral to Capital in an amount between approximately $2.1 and $2.9 million (the

---

[5]      The June Inventory Certification acknowledges that "Capital . . . is relying on the information contained in
this report for credit accommodations to the [Companies].  [The Companies] have also advised [their] accountants
that information submitted to Capital . . . is relied on for credit decisions."  (Grbic Aff. ¶ 85 (citing Ex 30).)

"Missing Inventory").  (Statement ¶ 48; Grbic Aff. ¶ 88.)  In October 2012, Capital obtained bills of lading from JND Warehouse showing that bulk shipments of inventory out of the Warehouses were made at the Companies' direction between July 16, 2012 and August 17, 2012, totaling 172,595 units and representing slightly less than half of the Missing Inventory.  (Grbic Aff. ¶ 89 (citing Ex. 32).)

### III.    The Companies Cease Operating

On August 24, 2012, Mr. Sharma notified Capital that he had closed the Companies. (Grbic. Aff ¶ 92.)  In response, Capital sent Mr. Sharma a Default Notice (the "First Default Notice") notifying him that the suspension of the Companies' business operations constituted an Event of Default under the Factoring Agreements.[6]  (Grbic Aff. ¶¶ 28-36.)  The First Default Notice demanded, among other things, that the Companies immediately "pay all amounts charged or chargeable to the Compan[ies'] account, which [were] immediately due and payable," "immediately assemble [the Companies'] Inventory and grant immediate access to [Capital] for purposes of taking possession of the same," and "cease the sale of Inventory."  (Grbic Aff. Ex. 12.)  Capital also reserved its rights under the Factoring Agreements and Security Agreements, including its right to inspect the Companies' books and records.  (Grbic Aff. Ex. 12.)

On that same day, Mr. Sharma met with various representatives from Capital, including Mr. Robert Grbic, Capital's Senior Executive Vice President and Chief Credit and Operating Officer, to discuss the Companies' default and Capital's exercise of its rights under the Factoring Agreements to take possession of Capital's collateral.   (Grbic Aff. ¶ 31-33; Affidavit of Defendant, Mr. Sandeep Sharma In Opposition to Plaintiff's Motion for Summary Judgment dated January 22, 2014 [Docket No. 20] ("Sharma Aff.") ¶¶ 16-18.)

---

[6]    Though Mr. Sharma disputes having received the First Default Notice, Capital faxed and mailed the First Default Notice certified return receipt to the last known address that Mr. Sharma provided for the Companies. (Grbic Aff. ¶¶ 46-47 (citing Ex. 14).)

On August 29, 2012, five days after the Companies' default, Mr. Sharma, along with his counsel, again met with representatives from Capital, including Mr. Grbic and Capital's outside counsel. (Grbic Aff. ¶ 39; Sharma Aff. ¶ 18-19.) At this meeting, Mr. Sharma turned over the keys to the Companies' office, along with various bank statements. (Grbic Aff. ¶ 39; Reply of Capital Business Credit LLC to Debtor's Counterclaims dated July 3, 2013 [Docket No. 7] ("Reply") ¶ 17.)

On September 4, 2012, Mr. Grbic, accompanied by an independent contractor retained by Capital, accessed the Companies' offices to search for the Companies' books and records, but was unable to find any accounting, inventory, or shipping records, whether in paper or electronic form. (Grbic Aff. ¶ 44.) Instead, Mr. Grbic was able to locate a "non-functioning computer server and a handful of desktop computers" that were "devoid of any financial information." (Grbic Aff. ¶ 44.) When Mr. Grbic asked Mr. Sharma that day where the Companies' books and records were located, Mr. Sharma replied that "he didn't know and that maybe some of the employees had stolen them." (Grbic Aff. ¶ 43.)

On September 4, 2012, Capital sent another notice of default (the "Second Default Notice") to Mr. Sharma and to the Companies, which demanded, among other things, that the Companies "immediately cease removing or otherwise disposing of . . . the Companies' books and records, wherever situated" and which demanded "immediate access" to the Companies' books and records.[7] (Grbic Aff. ¶ 46 (citing Ex. 14).)

At the same time, Capital attempted to obtain from the Warehouses any records of receipts, deliveries, and/or transfers of the inventory that had been stored or held by the

---

[7]     Mr. Sharma disputes having received the Second Default Notice; however, Capital also faxed and mailed the Second Default Notice certified return receipt to the last known address that Mr. Sharma had provided for the Companies. (Grbic Aff. ¶ 38 (citing Ex. 12).) In addition, Capital mailed the Second Default Notice certified return receipt to Mr. Sharma's last known home address and mailed and faxed a copy to Mr. Sharma's counsel. (Grbic Aff. ¶ 46 (citing Ex. 14).)

Warehouses. (Grbic Aff. ¶¶ 48-49, 51-52 (citing Ex. 15).)  On September 7, 2012, Capital sent a

letter to Access Plus requesting that it "retain all books and records regarding receipts, deliveries,

and transfers" of any of Capital's inventory being stored at Access Plus, and requesting that the

records "be made available to [Capital] for inspection and copying as soon as possible."  (Grbic

Aff. ¶ 52 (citing Ex. 15).)  On that same day, Capital received an e-mail from Access Plus stating

that Mr. Sharma had "advis[ed] [Access Plus] not to release any reports" to Capital.  (Grbic ¶ 53

(citing Ex. 17).)  Similarly, on September 10, 2012, Capital sent a letter to JND Warehouse

demanding "complete access to the Inventory records," which JND Warehouse had refused to

provide earlier in the day.  (Gbric Aff. ¶52 (citing Ex. 16).)  JND Warehouse responded that Mr.

Sharma had advised JND Warehouse to "hold of [sic] on giving any inventory or documents to

capital [sic] without further notification." (Grbic Aff. ¶ 53 (citing Ex. 17).)  On October 2, 2012,

Mr. Sharma's counsel requested that both Warehouses provide Capital with access to the

inventory stored at the Warehouses, but he neither instructed nor authorized the Warehouses to

provide Capital with access to the books and records that Capital previously had requested.

(Grbic Aff. ¶ 56 (citing Ex. 19).)

On October 5, 2012, Capital made a final demand that Mr. Sharma provide access to the

Companies' books and records, requesting that Mr. Sharma "provide written instructions to the

Warehouses . . . to immediately make available to [Capital] any and all books of record [sic] in

their possession pertaining to the Inventory."  (Grbic Aff. ¶ 57 (citing Ex. 20).)  Capital also

demanded that the Companies "immediately grant [Capital] full and complete access to each of

the Companies' own books of record [sic] and accounts wherever situated and whether in

electronic or paper form or otherwise." (Grbic Aff. ¶ 57 (citing Ex. 20).)  Nevertheless, Capital

8

has steadfastly maintained that it has not received or obtained any copies of the Companies'

books and records from Mr. Sharma.

## PROCEDURAL HISTORY

On October 10, 2012, Capital commenced an action in New York State Supreme Court

(the "State Court Action") against Mr. Sharma and the Companies, asserting claims for breach of

the Factoring Agreements, Security Agreements, and the Guaranties.[8]  Simultaneously, Capital

brought a motion, by order to show cause, for injunctive relief seeking, among other things, (a)

to obtain access to the Companies' books and records as well as the books and records of the

Warehouses and (b) to enjoin Mr. Sharma and the Companies from destroying, concealing,

altering, or otherwise disposing of any books and records of the Companies.  On October 11,

2012, the State Court issued a temporary restraining order enjoining Mr. Sharma from interfering

with Capital's rights to obtain access to the Warehouses' books and records.  (Statement ¶ 23;

Grbic Aff. ¶ 9.)

On November 1, 2012, Mr. Sharma filed a voluntary petition for relief pursuant to

chapter 7 of the Bankruptcy Code.[9]  On December 20, 2012, the State Court granted Capital's

motion for a preliminary injunction, granting it access to all of the Companies' books and

records and enjoining the Companies from destroying the same.  (Statement ¶ 25; Grbic Aff. ¶¶

60-62 (citing Ex. 21).)

On May 13, 2013, Capital commenced an adversary proceeding against Mr. Sharma by

filing a complaint objecting to his discharge under 11 U.S.C. § 727(a)(3) and to the

dischargeability of his debt to Capital under 11 U.S.C. §§ 523(a)(2) and (6).[10]  At the time of the

---

[8]     *See Capital Bus. Credit LLC v. Sierra Sportswear, Inc., et al.*, Index No. 653563/2012.
[9]     Case No. 12-14472 (SCC), Voluntary Petition [Docket No. 1] ("Petition").
[10]    Complaint of Capital Business Credit LLC Objecting to Discharge of Debts Pursuant to 11 U.S.C.
§§ 523(a) and 727(a)(3) [Docket No. 1] ("Complaint").

filing of the adversary proceeding, Mr. Sharma's debt to Capital, as guarantor of the Companies'

obligations, totaled approximately $2,275,585.26, plus interest.[11]  On June 13, 2013, Mr. Sharma

filed his answer, asserting six affirmative defenses and three counterclaims, including (a) that

Capital fraudulently induced the Companies to enter into the Factoring Agreements; (b) that

Capital breached the Factoring Agreements; and (c) that Capital violated the automatic stay by

continuing its action against the Companies in the State Court Action after he filed for

bankruptcy.

On July 3, 2013, Capital filed a reply to the counterclaims, asserting that Mr. Sharma's

affirmative defenses and counterclaims are insufficient as a matter of law.  On December 16,

2013, Capital filed a motion for summary judgment.[12]  On January 29, 2014, Mr. Sharma filed a

memorandum of law in opposition to Capital's motion for summary judgment.[13]  On February

14, 2014, Capital filed a reply.[14]  The Court heard oral argument on February 20, 2014.

## SUMMARY JUDGMENT STANDARD

Rule 7056 of the Federal Rules of Bankruptcy Procedure incorporates Rule 56 of the

Federal Rules of Civil Procedure in adversary proceedings.  Summary judgment pursuant to Rule

7056 is properly granted when there are no genuine disputed issues of material fact, and when,

viewing the evidence most favorably to the non-moving party, the movant is entitled to prevail as

a matter of law.  Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  The

moving party bears the burden of demonstrating that no material issues of fact exist.  *Knight v.*

*United States Fire Ins. Co*., 804 F.2d 9, 11 (2d Cir.1986), *cert denied*, 480 U.S. 932 (1987).  A

fact is deemed material if it "might affect the outcome of the suit under the governing law." *Big*

---

[11]     Complaint ¶ 83.
[12]     Motion for Summary Judgment [Docket No. 15] and Memorandum of Law [Docket No. 16].
[13]     Defendant's Memorandum of Law in Opposition to Plaintiff's Motion for Summary Judgment [Docket No. 19] ("Sharma Mem. Opp.").
[14]     Plaintiff's Reply Memorandum in Further Support of its Motion for Summary Judgment [Docket No. 25].

*Yank Corp. v. Bank One, Lexington, N.A. (In re Water Valley Finishing, Inc.)*, 170 B.R. 831, 833 n.4 (Bankr. S.D.N.Y. 1994) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). To defeat a motion for summary judgment, the non-movant must set forth specific evidence demonstrating the existence of a factual issue that is both material and genuine. *Liberty Lobby*, 477 U.S. at 247-48. Where there is no dispute as to material facts, summary judgment is appropriate.

When the moving party bears the burden of proof on a particular issue, it may discharge its burden by making a *prima facie* showing in support of its position on that issue. *UA Local 343 v. Nor-Cal Plumbing, Inc*., 48 F.3d 1465, 1471 (9th Cir. 1994). The moving party must present evidence that, if uncontroverted at trial, would entitle it to prevail on that issue. *Id*.; *Int'l Shortstop, Inc. v. Rally's, Inc*., 939 F.2d 1257, 1264-65 (5th Cir. 1991). Once the movant has done so, the non-moving party must set forth specific facts controverting the movant's *prima facie* case. *UA Local 343*, 48 F.3d at 1471.

## DISCUSSION

Capital asserts alternative grounds in support of its motion for summary judgment. First, Capital asserts that it is entitled to summary judgment on its request that Mr. Sharma's obligations to Capital, as guarantor of the Companies' debt, be excepted from discharge under (i) section 523(a)(2)(A) or (B) or (ii) section 523(a)(6) of the Bankruptcy Code. Alternatively, Capital asserts that it is entitled to summary judgment on its request that Mr. Sharma be denied a discharge under section 727(a)(3) of the Bankruptcy Code.

### I.    Applicable Law

Under section 727 of the Bankruptcy Code, an individual debtor is entitled to a discharge unless one of the twelve exceptions to discharge specified in section 727(a) is established. A

discharge under section 727(a) discharges the debtor from *all* pre-petition debts "except as

provided in section 523" of Title 11.  11 U.S.C. § 727(b); *see Cadle Co. v. Jacobowitz (In re

Jacobowitz)*, 296 B.R. 666, 670 (Bankr. S.D.N.Y. 2003) (citation omitted).  In other words,

section 727(a) discharges a debtor from all pre-petition debts, while section 523(a) limits the

effect of a discharge that has been entered.  *Master-Halco, Inc. v. Picard (In re Picard)*, 339 B.R.

542, 556 (Bankr. D. Conn. 2006).

Section 523(a) provides, in pertinent part, that a discharge under section 727 "does not

discharge an individual debtor from any debt" –

> (2) for money, property, services, or an extension, renewal, or refinancing of
> credit, to the extent obtained by –
>> (A) false pretenses, a false representation, or actual fraud, other
>> than a statement respecting the debtor's or an insider's financial
>> condition;
>> (B) use of a statement in writing –
>>> (i) that is materially false;
>>> (ii) respecting the debtor's or an insider's financial
>>> condition;
>>> (iii) on which the creditor to whom the debtor is
>>> liable for such money, property, services, or credit
>>> reasonably relied; and
>>> (iv) that the debtor caused to be made or published
>>> with intent to deceive; . . .
> (6) for willful and malicious injury by the debtor to another entity or to the
> property of another entity.

11 U.S.C. §§ 523(a)(2) and (6).

Section 727(a)(3) sets forth one of the twelve circumstances in which a debtor shall not

be granted a discharge; it denies a discharge to a debtor if

> the debtor has concealed, destroyed, mutilated, falsified, or failed
> to keep or preserve any recorded information, including books,
> documents, records and papers, from which the debtor's financial
> condition or business transactions might be ascertained, unless
> such act or failure to act was justified under all of the
> circumstances of the case.

11 U.S.C. § 727(a)(3).

As discussed below, the Court concludes that there are no genuine issues of material fact regarding Mr. Sharma's failure to preserve adequate books and records, and therefore, pursuant to section 727(a)(3), he is not entitled to a discharge.  The Court accordingly does not reach the question of whether Capital is entitled to summary judgment on its section 523 claims.

## II.   Pursuant to Section 727(a)(3) of the Bankruptcy Code, the Debtor is Not Entitled to a Discharge

The "purpose and intent of § 727(a)(3) of the Bankruptcy Code 'is to make the privilege of discharge dependent on a true presentation of the debtor's financial affairs.'"  *In re Kran*, 493 B.R. 398, 403 (S.D.N.Y. 2013) (quoting *In re Cacioli*, 463 F.3d 229, 234 (2d Cir. 2006)), *aff'd*, 760 F.3d 206 (2d Cir. 2014); *In re Martin*, 554 F.2d 55, 57 (2d Cir. 1977) (stating that the "denial of discharge serves both to deter inadequate record-keeping and to protect creditors whenever a failure to preserve records may have been motivated by fraud"); *Krohn v. Frommann (In re Frommann)*, 153 B.R. 113, 116 (Bankr. E.D.N.Y. 1993) (the fundamental policy of section 727(a)(3) is to ensure that a debtor's creditors receive "sufficient information to effectively enable them to 'trace the debtor's financial history, to ascertain the debtor's financial condition, and to reconstruct the debtor's business transactions'") (citations omitted).

The Second Circuit has articulated the standard that should be used in determining whether a debtor's books and records have been sufficiently maintained.  The court in *In re Underhill*, 82 F.2d 258 (2d Cir. 1936), *cert denied*, 299 U.S. 546 (1936), specified that "[c]omplete disclosure is in every case a condition precedent to the granting of the discharge, and if such a disclosure is not possible without the keeping of books or records, then the absence of such amounts to that failure to which the act applies."  *Id*. at 260.  "Accordingly, to make a threshold showing under section 727(a)(3) that discharge should be barred, the party objecting to

discharge must show: (1) that the debtor failed to keep or preserve adequate records and (2) that such failure makes it impossible to ascertain the debtor's financial condition and material business transactions." *In re Kran*, 493 B.R. at 403 (citing *Jacobowitz v. Cadle Co. (In re Jacobowitz)*, 309 B.R. 429, 436 (S.D.N.Y. 2004)) (internal quotation marks and additional citations omitted), *aff'd*, 760 F.3d 206 (2d Cir. 2014).   There is no intent requirement applicable to this subsection.  *See In re Underhill*, 82 F.2d at 259; *Jiminez v. Rodriguez (In re Rodriguez)*, No. 06-01119 (ALG), 2008 WL 3200215 at *4 (Bankr. S.D.N.Y. Aug. 5, 2008) ("No intent is necessary – it is sufficient to show that the debtor did not keep the books and records a reasonable person would maintain.").

        Once the creditor has made this threshold showing, the burden falls upon the debtor to satisfy the court that his failure to produce the financial records was justified.  *In re Cacioli*, 463 F.3d at 235 (citing *In re Sandow*, 151 F.2d 807, 809 (2d Cir. 1945) ("The statute puts the burden squarely upon the bankrupt who produces no financial records to produce at least a satisfactory explanation of their absence.") (other citations omitted)).   While the Bankruptcy Code does not define what constitutes a "justification" for a failure to maintain records under section 727(a)(3), the Second Circuit has stated that "whether a debtor's failure to keep books is justified is a 'question in each instance of reasonableness in the particular circumstances.'"  *In re Cacioli*, 463 F.3d at 235 (citing *In re Underhill*, 82 F.2d at 259-60); *see also Meridian Bank v. Alten*, 958 F.2d 1226, 1231 (3d Cir. 1992) (stating that "[t]he issue of justification depends largely on what a normal, reasonable person would do under similar circumstances").   The Second Circuit has stated that it is a "loose test, concerned with the practical problems of what can be expected of the type of person and type of business involved."  *Morris Plan Indus. Bank of N.Y. v. Dreher*, 144 F.2d 60, 61 (2d Cir. 1944).   However, the explanation for loss of business records "must be

14

more than just vague and general oral assertions that assets or records are no longer available."

*State Bank of India v. Sethi (In re Sethi)*, 250 B.R. 831, 839 (Bankr. E.D.N.Y. 2000) (citation

omitted).  A sophisticated debtor is generally held to a higher level of accountability in record

keeping, and the more complex the debtor's financial situation, the more numerous and detailed

the debtor's financial records should be.  *Id*.

### A.  Mr. Sharma Failed to Preserve Adequate Records

It is undisputed that Mr. Sharma, as a sophisticated businessman, president, and sole

owner of the Companies, had a duty to take reasonable measures to preserve the Companies'

financial records.  Mr. Sharma failed to do so.  The Companies' offices, when searched after the

Companies ceased operating, contained no books or records; their computers were devoid of any

data.  Capital maintains that, despite the notices of default that were issued, Capital never

received copies of the Companies' books and records from Mr. Sharma.  Mr. Sharma argued,

unpersuasively, that he in fact satisfied his duty to turn over the Companies' books and records

because he permitted Capital to access the Companies' offices and take possession of the

Companies' computers after the Companies ceased operating.  (Sharma Mem. Opp. at 15.)  Mr.

Sharma does not dispute, however, that although he permitted Capital access, the Companies'

offices did not contain any physical books and records and the Companies' computers were

devoid of any useable data.  (Grbic Aff. ¶¶ 34-49.)  Merely allowing Capital to enter the

Companies' offices, which contained no records, does not satisfy Mr. Sharma's burden, and fails

to create a disputed issue of material fact as to whether Mr. Sharma adequately preserved the

Companies' records.  *See In re Frommann*, 153 B.R. at 116.

Mr. Sharma contends, alternatively, that he satisfied his duty to preserve the Companies'

records because he provided copies of the Companies' bank statements to Capital for the year

2012.  (Sharma Aff. ¶ 19.)  Merely providing eight months' worth of bank statements is insufficient to meet the requirement that a debtor adequately preserve the books and records of operating businesses such as the Companies.  The purpose of section 727(a)(3) is to ensure that creditors receive sufficient information to enable them to trace the debtor's financial history and business transactions.  Providing eight months' worth of bank statements is categorically inadequate, and fails to establish the existence of a disputed issue of material fact as to Mr. Sharma's preservation of the Companies' books and records.

Mr. Sharma sought to justify the absence of the records by speculating that the books and records must have been "stolen" by an employee.  Mr. Sharma provided absolutely no evidence that any such theft had occurred.  Mere oral statements, without more, do not create a genuine issue of material fact, and fail to support a justification for the absence of the Companies' books and records.  *See Lipton v. Nature Co.*, 71 F.3d 464, 469 (2d Cir. 1995) ("a party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment") (citing *Knight*, 804 F.2d at 12); *see also Quinn v. Syracuse Model Neighborhood Corp.*, 613 F.2d 438, 445 (2d Cir. 1980) ("mere conclusory allegations or denials" in legal memoranda or oral argument cannot themselves create a genuine issue of material fact where none would otherwise exist) (quoting *SEC v. Research Automation Corp.*, 585 F.2d 31, 33 (2d Cir. 1978)).

Indeed, it became clear beyond peradventure at the hearing held before this Court that Mr. Sharma failed to maintain the Companies' books and records.  When asked at the hearing where the Companies' books and records were located and why Mr. Sharma was unable to produce copies of the documents, counsel for Mr. Sharma was unable to provide an adequate answer, arguing – despite all evidence to the contrary – that Capital had already been given

16

possession of the books and records.  (Transcript of Hearing on February 20, 2014 ("2/20/14 Tr.") at 37:22-38:5.)  Specifically, when asked by the Court where the Companies' books and records were located at the time of the hearing, counsel for Mr. Sharma asserted that the books and records were "handed over to [Capital]." (2/20/14 Tr. at 21:15-22:8.)  But Mr. Sharma's counsel was unable to provide a receipt or any other evidence confirming delivery of the records to Capital.  (2/20/14 Tr. at 38:6-40:7.)  Instead, counsel for Mr. Sharma cited to the deposition transcript of Mr. Sharma's previous attorney, Ms. Marilyn Simon, to support his argument that the Companies' books and records had been turned over to Capital.  (2/20/14 Tr. at 22:9-23:19.)  Ms. Simon's deposition, however, does not lend any such support.  Indeed, when Ms. Simon was asked in her deposition whether Mr. Sharma had, in fact, turned over the Companies' books and records to Capital, she stated that she did not know, but assumed that he had because she had not heard from Capital to the contrary before her representation of Mr. Sharma ceased on or around September 5, 2012.  (Simon Tr. at 62:20-74:5.)

Nevertheless, Mr. Sharma's counsel insisted at the hearing that the Companies' books and records *must have* been produced to Capital by Mr. Sharma because Capital had included certain of the Companies' financial information as exhibits to its motion for summary judgment. Counsel for Capital explained to the Court that it had obtained this information through multiple Rule 2004 examinations, discovery in the State Court Action, and from the Warehouses – not from the Companies – and steadfastly maintained that Mr. Sharma never produced copies of the Companies' books and records to it.  (2/20/14 Tr. at 23:20-25:20.)  Mr. Sharma's assertions at the hearing failed to create a genuine issue of material fact justifying denial of Capital's motion for summary judgment.

17

Moreover, Capital provided undisputed evidence that Mr. Sharma actively attempted to conceal records, including by preventing Capital from obtaining copies of the Companies' books and records from the Warehouses.  Emails produced by the Warehouses to Capital in connection with the State Court Action, and attached as exhibits to Capital's motion for summary judgment, indicate that Mr. Sharma instructed the Warehouses not to release any documents to Capital without his approval.  (Grbic Aff. ¶¶ 51-59.)  Mr. Sharma does not dispute this contention; rather, he argues instead that his counsel instructed the Warehouses to permit Capital to access the Companies' inventory; he provided no evidence that his counsel instructed the Warehouses to permit Capital to inspect the Companies' books and records that were maintained by the Warehouses.  (Grbic Aff. ¶ 56 (citing Ex. 19).)  Accordingly, the Court finds that there is no genuine issue of material fact with respect to whether Mr. Sharma failed to preserve any recorded information, including books, documents, records, and papers, from which the Companies' or Mr. Sharma's financial condition or business transactions might be ascertained.

### B. The Failure to Preserve the Companies' Books and Records Made it Impossible for Capital to Ascertain Mr. Sharma's Liability as Guarantor of the Companies' Debt

As discussed above, it is undisputed that the Companies' offices were devoid of financial information and that Mr. Sharma only provided eight months' worth of bank statements to Capital.  While Capital was able to obtain certain information about the Companies' business operations and financials through Rule 2004 examinations, discovery in the State Court Action, and records maintained by the Warehouses, Capital asserts that these records, and the bank statements obtained from Mr. Sharma, were "necessarily" too scant to provide an accurate picture of the Companies' accounts and finances, which, in turn, made it impossible for Capital to ascertain Mr. Sharma's liability to Capital as guarantor of the Companies' debt.  Notably, Mr.

18

Sharma does not contend that Capital had sufficient financial information about the Companies to estimate his debt to Capital, and therefore no issue of material fact exists on this point.

The purpose of section 727(a)(3) is to provide creditors and the court with "complete and accurate information concerning the status of the debtor's affairs and to test the completeness of the disclosure requisite to a discharge." *Nof v. Gannon (In re Gannon)*, 173 B.R. 313, 321 (Bankr. S.D.N.Y 1994) (quoting *Meridian Bank*, 958 F.2d at 1230). It is clear that the scant information provided by Mr. Sharma to Capital was not only wholly insufficient as a record of the Companies' business and financial affairs but also irrelevant to Capital's ability to assess Mr. Sharma's outstanding liability as guarantor of the Companies' debt. While the Court recognizes the fundamental importance of the doctrine of discharge to provide a debtor with a fresh start, the privilege must be balanced with the debtor's obligation to provide creditors with a true presentation of his financial affairs. Where, as here, a debtor engages in unjustified activity that prevents a creditor from ascertaining the debtor's financial history and liabilities, the Court must deny the debtor a discharge. Because there is no genuine issue of material fact that Mr. Sharma failed, without justification, to preserve adequate records and that such failure made it impossible to ascertain Mr. Sharma's liability to Capital as guarantor of the Companies' debt, the Court finds that Mr. Sharma is not entitled to a discharge pursuant to section 727(a)(3) of the Bankruptcy Code.

### III.    Mr. Sharma's Counterclaims Must be Dismissed as a Matter of Law

Mr. Sharma interposed three counterclaims against Capital: (a) that Capital fraudulently induced the Companies to enter into the Factoring Agreements; (b) that Capital breached the Factoring Agreements; and (c) that Capital violated the automatic stay by continuing its action against the Companies in the State Court Action after Mr. Sharma filed for bankruptcy. Because

19

each counterclaim fails to state a claim upon which relief may be granted, the counterclaims must be dismissed as a matter of law.

### A.    Rule 12(b)(6) Standard

Rule 7012(b) of the Federal Rules of Bankruptcy Procedure, which incorporates Federal Rule of Civil Procedure 12(b)(6) ("Rule 12(b)(6)"), permits a bankruptcy court to dismiss a claim or counterclaim if a complaint fails to state a claim upon which relief may be granted.  In reviewing a motion to dismiss under Rule 12(b)(6), the Court accepts the factual allegations of the complaint as true and draws all reasonable inferences in the plaintiff's favor. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007); *E.E.O.C. v. Staten Island Sav. Bank*, 207 F.3d 144, 148 (2d Cir. 2000).  To survive a challenge to the adequacy of a complaint under Rule 12(b)(6), the factual allegations in a complaint must be supported by more than mere conclusory statements. *Twombly*, 550 U.S. at 555.  The allegations must be sufficient "to raise a right to relief above the speculative level" and provide more than a "formulaic recitation of the elements of a cause of action." *Id.* (citations omitted).  A court may dismiss claims or counterclaims unless a plaintiff pleads "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570.  "[O]nly a complaint that states a plausible claim for relief survives a motion to dismiss." *Iqbal*, 556 U.S. at 679 (citing *Twombly*, 550 U.S. at 556).  Therefore, the appropriate inquiry "is not whether a plaintiff is likely to prevail, but whether [he] is entitled to offer evidence to support [his] claims." *Chance v. Armstrong*, 143 F.3d 698, 701 (2d Cir. 1998) (citations omitted).

### B.    Mr. Sharma Lacks Standing to Assert That Capital Fraudulently Induced the Companies to Enter into the Factoring Agreements and That Capital Breached the Factoring Agreements

Mr. Sharma asserts (i) that Capital made fraudulent misrepresentations to induce Mr. Sharma, on behalf of the Companies, to enter into the Factoring Agreements with Capital and (ii) that Capital breached their agreement by refusing to extend credit to the Companies in accordance with the terms of the Factoring Agreements. Inasmuch as these counterclaims can properly be brought only by the Companies,[15] Mr. Sharma lacks standing to bring them.

First, the Guaranties executed by Mr. Sharma expressly bar him from asserting a counterclaim that belongs to the Companies. Each of the Guaranties provides, in pertinent part,

> [i]n the event any claim or action, or action on any judgment, based on this Guaranty, is made or brought against [Mr. Sharma], [Mr. Sharma] agree[s] not to assert against [Capital] any setoff or counterclaim which the [Companies] may have, and further, [Mr. Sharma] agree[s] not to deduct, setoff, or seek to counterclaim for or recoup, any amounts which are or may be owed by [Capital] to [Mr. Sharma], or for any loss of contribution from any other guarantor.

(Grbic Aff. Ex. 9 (Guaranties at 1).) The provisions of the Guaranties make clear that in the event of a dispute between Mr. Sharma and Capital based upon Mr. Sharma's obligations under the Guaranties, Mr. Sharma is prohibited from asserting against Capital any counterclaim that belongs to the Companies. Furthermore, under New York law, a guarantor sued alone by a creditor cannot assert, as a defense or a counterclaim, an independent cause of action belonging to his principal.[16] *See e.g., Woodward & Dickerson, a Div. of ConAgra, Inc. v. Kahn*, 767 F. Supp. 530, 534 (S.D.N.Y. 1991) (citing *Walcutt v. Clevite Corp.*, 13 N.Y.2d 48, 55 (1963)); *Ettlinger v. Nat'l Sur Co.*, 221 N.Y. 467, 471 (1917). Accordingly, the first and second counterclaims fail to state a claim upon which relief may be granted.

---

[15]    The issue of whether the Companies have any valid claims against Capital is not before the Court, and, as such, the Court does not address it.

[16]    Although an exception to this rule may exist where a principal is controlled by the guarantor, such exception does not apply where, as here, the company is no longer a going concern. This is so because the limited exception is based on a notion of implied consent by the principal, which consent can be inferred by the fact that the guarantor controls and speaks for the principal. *See First New York Bank for Bus. v. DeMarco*, 130 B.R. 650, 655 (S.D.N.Y. 1991).

C.    **Capital Did Not Violate the Automatic Stay by Continuing the State Court Action Against the Companies After Mr. Sharma Filed for Bankruptcy**

Mr. Sharma argues that Capital violated the automatic stay by continuing the State Court Action against the Companies after Mr. Sharma filed for bankruptcy, because continuing the action against the Companies "necessarily emboil[s]" Mr. Sharma in that action.  (Answer ¶ 38.) This counterclaim must also be dismissed as a matter of law.  The automatic stay under 11 U.S.C. § 362(a) only provides protection for the debtor; except under extraordinary circumstances, it does not provide protection to non-debtor third parties.  *See Gray v. Hirsch (In re Gray)*, 230 B.R. 239, 242 (S.D.N.Y. 1999) ("courts in this circuit regularly refuse to extend a debtor corporation's § 362 stay to its non-debtor officers and principals") (citing *Teachers Ins. & Annuity Ass'n v. Butler*, 803 F.2d 61, 64-66, (2d Cir. 1986)); *Uto v. Job Site Servs., Inc.*, 444 B.R. 222, 224 (E.D.N.Y. 2011) (automatic stay not extended to company owned by liquidating chapter 7 debtor).  Here, the automatic stay applies to and protects only Mr. Sharma, the debtor in the instant case.  The automatic stay does not apply to the Companies.  Inasmuch as this counterclaim seeks to assert that Capital violated the automatic stay by continuing the State Court Action against the Companies after Mr. Sharma filed for bankruptcy, Mr. Sharma fails to state a claim upon which relief may be granted.

## CONCLUSION

For the reasons stated, Capital's motion for summary judgment is granted.  Pursuant to section 727(a)(3), Mr. Sharma is not entitled to a discharge.  Mr. Sharma's counterclaims are dismissed, with prejudice, for failure to state a claim upon which relief may be granted.  The parties are directed to submit an order consistent with this decision.

Dated: New York, New York
       November 4, 2014

                                    _/s/ Shelley C. Chapman_____
                                    UNITED STATES BANKRUPTCY JUDGE